After this one, can we take five minutes before DNC? Sure, absolutely. Thank you. You want to do it now? No, I'm happy to wait. Okay. Thank you. Ms. Roberta, not every panel of this court would be as easy on a lawyer who wasn't here exactly. I can think of somebody in particular who wouldn't be easy on a court. I understand that. I beg your indulgence. That's okay. We're easy. Thank you. Oh, I hope so, this morning. That's the end of these. Uh-oh. Good morning, Your Honors. Is this the first time you've been before us? I'm sorry? This is not the first time you've been before us. Oh, no, Your Honor. No, I know. With the court's permission, I did reserve three minutes for rebuttal. Sure, but tell us who you are on the record.     I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I'm a lawyer. I represent the Pennsylvania Attorney General's Office, and I represent the appellants in this case who are the custodial officials who were the respondents in this habeas corpus action. It's always surprising when we see the Attorney General coming up as the appellant. I know. I've been sitting in that chair more than once lately. But, Your Honor, I think that when I, we've addressed in very detailed a lot of our position in our briefs, and I'm not going to try to waste the Court's time this morning with repeating a lot of it. But, in a nutshell, we're asking the Court to do, to reverse the District Court's order granting habeas relief here. Relief was in the form of a new trial. And we think there are two reasons why the Court should do that. If the Court agrees with us on the first reason, which is a procedural or technical reason, it need not reach the other. The first issue, as we have said in our papers, is that the claim on which relief was granted here was actually procedurally defaulted. And procedurally defaulted, can you hear me better, Your Honor? As we've explained, the claim on which relief was granted was an ineffectiveness of counsel claim, and trial counsel in particular. And the specific issue in this instance was that counsel did not retain and present the testimony of an expert witness to describe the physical properties of liquid morphine, which under the brand name of Roxanol. And that was an issue because the defendant in this case was convicted of poisoning her husband through a lethal dose of Roxanol. And there became an issue at trial as to whether or not the defendant had poisoned her husband or whether the decedent had committed suicide. That was the defense in the case. And the question of whether or not counsel should have retained an expert was an issue that was never raised on direct appeal in this case. The defendant had very able trial counsel. He did not put on testimony by an expert witness. And the Commonwealth's evidence on this point was rather sparse. And he did not call a rebuttal witness to describe the physical properties of Roxanol. Who was sparse? The Commonwealth? The Commonwealth's testimony on this point. We don't get ineffective assistance of counsel against the Commonwealth. No. But in this case, the testimony presented by the Commonwealth in its case against the physical properties of Roxanol, the forensic pathologist who had conducted the autopsy and established the cause of death had... Does that mean that if we do not find procedural default, you would agree that there must have been ineffective assistance? Because if your evidence was not, excuse me, if your evidence was sparse on this point, wouldn't that be the logical place to go? Oh, not at all, Your Honor. Just the opposite. I mean, I've illustrated the point. This is a comparative description of the evidence in the case. There was a great deal of evidence against this defendant. Evidence of motive, which was both financial and possibly a romantic entanglement was figured here. There's evidence that in the past this witness had put controlled substances in the decedent's food when she wanted him to be out of the way. There's a whole wealth of evidence in the case. This issue has gotten blown out of proportion over time. And I'd like the court to put it in its proper perspective. When I say the evidence the Commonwealth presents here about the physical properties of Roxanol was sparse, in the grand scheme of things, it was a relatively minor point compared to some of the other evidence. And the only evidence in the case that was presented by the prosecution was that the on his hand tasted them and said that, oh, well, he thought maybe they could be masked in something like coffee. It was really the factual issue, wasn't it? It was a fact. Whether it could be masked. It was an issue. Was that an expert opinion? I guess it was proffered as such, though. My recollection of the testimony, I'm not sure it was actually, the foundation was actually laid completely for that. What he said was, I tasted it to see what it tasted like, and based on the taste, I felt it could be disguised without any problem. I'm not sure that's an expert opinion. I think it's a lay opinion more than it's an expert opinion, Your Honor. I would have to say it's probably, because he didn't. What expertise did he have? I'm asking you against your interest here. No, but I'm not saying that, Your Honor. I just said in reply that I thought that it was probably more of a lay opinion, though it's been, I think, characterized in the papers below. And I don't want to mislead the court by trying to change horses now at this level. Before I forget it, can we go back just before we leave procedural default? My understanding was that the court granted relief on a claim that appellate counsel was ineffective for investigating and failing to investigate and failing to get an expert witness. No, Your Honor, and that's the problem. And that's the heart of this issue. That claim no longer existed at the time appellate counsel came into the case. And under Pennsylvania law, if you do it, this was back in the time there was a case called Hubbard, the Hubbard rule, which required a criminal defendant to raise an ineffectiveness claim involving his trial counsel the first moment he was represented by somebody who was a new counsel. This happened in this case at the direct appeal stage when Mr. Kostopoulos took over from Mr. Radinsky. Oh, I'm sorry. This happened at the point, the claim became waived at that level, the direct appeal level when Mr. Kostopoulos assumed representation of the defendant. And it became waived in this fashion. It was a voluntary waiver on top of things because Mr. Kostopoulos, when he took the case over, identified what he thought were 15 good appealable issues. He and his team decided they were only going to pursue eight, that they would winnow them down and they were following Judge Aldistert's advice and as well as the Supreme Court authority expressed by former Chief Justice, one of the former Chief Justices and Justice Jackson that there was no requirement under the Sixth Amendment that counsel pursue every single claim. That you could pick the better claims, winnow the wheat from the chaff so to speak. That's what they did. To use counsel's words, we weren't going to shotgun the appellate court. So with the defendant's consent, they did not pursue this claim. So at that point it was waived. With which claim? When you say this claim, which claim? The claim that relief was granted on the defense counsel at trial should have retained an expert on the Roxanne properties. That claim became waived. On the default issue, why doesn't, put note three in, Steele, if that's how you pronounce it. Why doesn't that resolve the issue? Steele. S-T-I-E-L-E-L. Not the T-K's. What's that? Steele.  Steele. I said Steele. Steele. I'm not, and off the top of my head, your honor, I have to admit I don't recall what that said specifically. I'll be happy to tell you. If you'd be kind enough. If it is ultimately determined that Steele's, this is part of the footnote. I won't read you the whole thing. A little longer. If it is ultimately determined that Steele's ineffective assistance of trial counsel claims have merit, it is likely that a similar determination will be made to the defense counsel. respect to the claims regarding appellate counsel, in which event, there would be no waiver under Pennsylvania's layering of ineffective assistance line of cases, and no procedural default by virtue of the doctrine of cause and prejudice. Well, the answer to that is, that is not totally correct. You can have a determination under Pennsylvania law that- The footnote is not totally correct? Well, it doesn't correctly summarize Pennsylvania law, because the reason is this. Under Pennsylvania law, if you have a layered claim, the first aspect that you have to look at is whether the underlying claim has arguable merit. In this case, you'd be looking at whether or not the claim that trial counsel should have retained an expert had arguable merit. But the analysis doesn't stop there. Even if you answer that question in the affirmative, and you say, yes, oh yes, that would have had some merit, you still have to go on to the next two steps. The next step is, was there a tactical reason why that claim was in pursuit? And was there a reasonable tactical or strategic basis? And then, assuming that there was none, then you have to go on to a third step as to whether the defendant was prejudiced. In this case, on the second part of that test, this is the second prong of the Pierce test, we've referenced that in our brief. There was a reasonable tactical call, and the Pennsylvania courts made that determination. So then and there, that claim is over. The layered in effect in this case is done at that point. I'm sorry. The Pennsylvania court. You mean the PCRA court? At the PCRA. Well, the Superior Court on appellate review from the PCRA courts. You mean on direct review? I'm sorry? No, on collateral review, Your Honor. Okay. This issue did not arise until collateral review in Pennsylvania. Right, that's right. And the claim on collateral review is that appellate counsel was ineffective because he didn't argue that trial counsel should have done this, because he didn't pursue the claim about trial counsel's non-retention of an expert. But I don't understand your assessment that there was a reasonable tactical basis, that the PCRA court said that there wasn't. And now the district court here on 2254 review says that it wasn't. How can we, even if we applied this three-step process that you're talking about, say that it was? No, they said there was a reasonable tactical basis. And the reasonable tactical basis for appellate counsel abandoning the claim was that it was as part of his decision to only go with certain claims and not all claims that he could possibly reach. And he determined that that was a professionally responsible decision. And as a result of that, the court determined that there was no ineffective assistance rendered by appellate counsel. It was over at that point. But the most important aspect of this for purposes of this case, as we've said in our papers, is that the underlying claim here, the claim about whether defense counsel should have retained an expert, was waived at that point. It was technically waived at that point. It was gone forever. Because they didn't raise it on appeal? Is that your point? They can't pursue that claim. Because they didn't raise it. It was one of the 15 claims that they dropped? Right. It was deliberately waived. And as a result, in the collateral... Well, now you've got me confused. You're talking about direct appeal from the PRC? On direct appeal, it was waived. Because there was a decision made by Mr. Kostopoulos not to pursue the claim. Then the claim, the whole issue of this comes back again on the collateral line of review. And at that stage, the question that is being pursued is whether appellate counsel is himself ineffective for abandoning that claim. And the Superior Court ruled that he was not. So that claim has been long over. It no longer exists. It was waived at the direct review level. It was never resuscitated at any other point. Liz, I don't want to put any pressure on you, but you said there were two points, and you're still on the first, which is the procedural default. Just tell us briefly, what is the second? The second is that the court erred in determining that relief was warranted, that the state court decision was unreasonable under Strickland. That's an erroneous decision. The court did not make the right analysis on that. It engaged in a de novo review when it should have been asking the question, was the state court's decision in terms of Strickland reasonable? And the answer to that is clearly yes. It was faithful to Strickland. It did everything it should have done under Strickland. And as the U.S. Supreme Court has recently reiterated, when you have a Strickland review in a habeas setting, there's got to be a doubly deferential review. Not only do you have ed pediferance, but the reviewing federal court has to look at the state decision and understand that when the state court was ruling, it was obliged to give deference to counsel's performance, too. Okay. Let me ask you one question to make sure I ask it. Should we CAV this case until the Supreme Court decides Harrington v. Richter, which it heard on October the 12th? I think you can decide it based on what you have now, Your Honor, but it might be prudent to see what else they say in that decision. I don't know exactly if that decision will bear directly on point, but it may be worth deferring to see if they add anything further on this whole issue. Okay. Thank you. Thank you. May it please the Court, my name is Caroline Roberto, and I represent the appellee, Judy Ann Showers. And to answer Judge Stapleton's question, in preparation for today's argument, I read the argument transcript from the United States Supreme Court on the Richter case, and it looks like it was a procedural issue that they want to reach first, and the expert witness issue is going to be extremely fact specific. And I think that we can decide this case, you all can decide this case, on the facts of this specific case before the Richter decision comes down. That's just my assessment from the argument. I did not read the briefings or the briefs in the Supreme Court. But I would like to address, first of all, the procedural default issue. Now, on behalf of Ms. Showers, I filed the PCRA petition in 1998 in the state court, and at that time there were no cases requiring this layering process. The layering process didn't come into existence in the Pennsylvania courts until approximately 2001 in the Williams decision. So already in 2001, we had our decision from the Superior Court. In the PCRA, I had to revive the claim of trial counsel's ineffectiveness. And if you look at the PCRA statute in effect at the time, there is a subsection 4, 42, section 9543A4. And that section says that you as the petitioner has to plead and prove, by a preponderance of the evidence, that the failure to litigate this issue on direct appeal, trial counsel's ineffectiveness, the failure to litigate the issue on direct appeal could not have been the result of any rational, strategic, or tactical decision by appellate counsel, by counsel. So what I did when we did the 1998 PCRA is I alleged trial counsel's ineffectiveness as the substantive claim, and then I went to subsection 4, scrupulously honoring the statute, and laid out why we should excuse waiver, or excuse failure to litigate, because Mr. Kostopoulos did not raise it, and that was not a strategic issue. Or a strategic decision, I should say. So when we were granted the evidentiary hearing, I called Mr. Kostopoulos and made that argument, asked him questions, and made the argument. That's how the substantive ineffective assistance was preserved in state court. Now, the superior court gets the case on PCRA appeal because the state trial court denied, and they reach the issue. They don't reach procedural default, they reach the substantive issue. And they cite no less than three times this subsection 4. And I would call the court's attention to showers 2, which is in the appendix at page 110, for a recitation of the lower court saying, state court saying, this is why we're going to reach this issue, because it's subsection 4. Counsel has asked us to explore subsection 4. So that's number one, why there's no procedural default. The state courts looked at the case, I argued it as it was supposed to be argued back in 1998. We get to habeas, and there is now beginning in 2003 and 2004, all of this morass about layering appellate counsels and effectiveness as well. So we make sure that the district court understands that appellate counsel was also ineffective for failing to raise this issue. And in fact, that's exactly what Judge Caputo in the district court held. He went immediately to the substantive issue of trial counsel's ineffectiveness, but he also made the factual finding that appellate counsel was indeed ineffective, too, for failing to raise and preserve the issue. Now, I think that's the second reason why there's no procedural default, because we layered it clearly as much as we could in the district court. Now, thirdly, the footnote that Judge Greenaway refers to is in seal, and it's Judge Stapleton's opinion wherein Judge Stapleton said, in this particular situation, where you find that appellate counsel, excuse me, you find that trial counsel was ineffective, then almost ipso facto, almost. Not quite, but almost ipso facto, appellate counsel's going to be ineffective. Now, what Judge Caputo did is he went very scrupulously through the record and said, here's why appellate counsel was not acting reasonably for waiving this issue. He raised four or five issues that the standard of review was abuse of discretion, very low standard of review. He also raised the issue of insufficiency of the evidence. Now, that's almost always a dead loser on appeal, but he did not raise the issue that we actually won on in the district court, ineffectiveness of trial counsel for failing to call the expert witness, and he said because he didn't want to shotgun the court. However, in giving that explanation, when I asked him on direct examination at the PCRA hearing, did you do any investigation to develop that issue, to pursue that issue, to understand that issue, he said no. And there's case law, again, in SEAL, and I think, Judge Sloviter, in your opinion in Hummel, you also talk about the fact that counsel cannot have a reasonable basis when counsel does not do the investigation. You can't reach a reasonable basis when there's no investigation done to support that strategic or alleged strategic decision. Well, that issue was done by the Supreme Court. Right. And when it affirmed or reversed, on my case. On what was maybe Rompella? On the investigation. Uh-huh. But it's the law. It's a suitor opinion. Isn't it clear here that trial counsel did conduct an investigation and talked to, what is his name? Judge, Dr. Doyle. Dr. Doyle. And Dr. Doyle told him that he didn't see how he could give an expert opinion on whether you could possibly, something about taste of the liquid. And he talked to several pharmacists, and they said they couldn't give an expert opinion. And he had Helen Wolfe, who had taken it on a regular basis and had taken it with orange juice and had said that she could not mask it and it tasted terrible and you couldn't take this without knowing what you were doing. And he said, I was left with Helen. And actually, Helen's testimony was better, wasn't it, than the government's testimony? All this, quote, expert could say was, I put two drops on my hand and tasted it and I don't think it could be masked. That's not an expert opinion. With all due respect, Your Honor, I disagree. I think what Dr. Doyle said. What expertise was he using that you and I or I could not, you were not experts, could you? I think, first of all, to answer your question, I called Dr. Doyle at the evidentiary hearing to testify. And he said that he told trial counsel he himself, as a psychiatrist, could not render that opinion, but that there were indeed other people out there that could. In fact, he even said that he contacted a pharmacist, a local pharmacist. He contacted the pharmacologist at the laboratory that made the Roxanol, who also said, we can't recommend any substance that could disguise this. It's such a bitter, noxious taste. So Dr. Doyle really begged trial counsel to find an expert, and they're out there, because he felt that that was the crucial issue, as Judge Tamelia in state court felt in his dissenting opinion. So, you know, I think that trial counsel, when he called Mr. or Mrs. Wolf, she, and Judge Caputo goes over this very carefully, only took Roxanol one time. As a lay witness, she took it one time because she said it was so bad, I tried to dilute it in orange juice, and I couldn't take it, so I never took it again. But more importantly, she had lots of issues in this case. She had an affair at one point with the deceased. She wasn't really that close a friend with the defendant. So I think she was not the best person to have testified to this. Also, and I think this is important, that Dr. Mihalikas was the pathologist who was called as an expert witness. It's my recollection from the record that the expert instruction was given to the jury regarding Dr. Mihalikas. Dr. Mihalikas said this substance could indeed be disguised and surreptitiously administered. That's the whole crux of this case. Was it surreptitiously administered? Well, in cross-examination, he said I didn't, but I didn't try to do it, so it's just because I tasted a couple of drops and thought you couldn't mask that. But based on that, the Commonwealth argued she did it. We don't know exactly how she did it, but she did it. Now, the expert witness that I called Dr. Wecht at the evidentiary hearing said not only didn't she do it from this evidence, she could not have done it from this evidence for the following reasons. There was a large amount of Roxanol in his system. There was nothing in his abdomen on autopsy to show that there was any disguising substance. There was no regurgitation in the neck. And most importantly, from my perspective, because this did not come out at trial, from the scene and from the autopsy, there was nothing to show there was a struggle. So, based upon all of those things, Dr. Wecht opined that it was consistent, that voluntary ingestion, voluntary ingestion, suicide, was consistent with the autopsy and the other facts of this case. And that was the crux of the matter. So, I think that when Judge Caputo found that if you look at what counsel did, he argued and he cross-examined, that that is not paramount or even tantamount to calling an expert witness. An expert witness that can reach the ultimate issue in the case, that it was voluntary ingestion versus murder. So, based upon the weighing and determining those two alternatives, I think Judge Caputo rightfully reached the decision that it was the state court's decision was an unreasonable application of Strickland. So, I think under the circumstances that this court should affirm Judge Caputo, not only on the basis that there was no procedural default for the three reasons I've said, but also on the basis that the state court's decision was an unreasonable application. Thank you. Are you pro bono by any chance? I am not pro bono. Okay, thanks. Thank you. Your Honors, the argument we just heard illustrates beautifully what's wrong with the position here that the epilee takes and that the district court took below. We just heard in great detail an examination and an application of Strickland, evaluating whether or not she was entitled to relief. That's not the issue that should have been addressed by the district court. The correct issue was whether the state courts had reasonably applied Strickland. All these different details about coulda, woulda, shoulda don't go to that analysis. What that is is a de novo review. It's substituting someone else's post hoc judgment. Monday morning quarterbacking. And I say that with the utmost respect for the district court. But all this is is someone saying it should have been done differently or I would have done it differently. It's not answering the essential question is whether or not the state court's properly evaluated counsel's performance under Strickland. There is a wide range of professionally acceptable behavior. And the one thing the district court missed here was thinking about this issue from the opposite end of things. From the perspective of a seasoned trial practitioner. And make no mistake, Mr. Radinsky is a very fine criminal defense attorney. But when you see things unfold in trial, you make strategic changes, you make decisions. And in this case, as the record was unfolding on this issue, he realized he had a golden opportunity here. He didn't want to make more of this issue. He could tear down the Commonwealth's case by ridiculing the test of the expert Commonwealth witness on this who tasted two drops on his hand. He had solid testimony. And the one witness who had actual experience of ingesting large doses of it. And every point that Mr. Robert... I'm sorry, who ingested large doses? Mrs. Doyle, the woman who had cancer who had the rocks and all. She's the one who tasted it and so vehemently reacted to it. That testimony was great for him. And he knew it. I'm sorry. Did I call her Mrs. Doyle? Dr. Doyle. I'm mixing the names up. It's Mrs. Wolfe. I'm sorry. I thought Mrs. Wolfe only took it one time. And it was a memorable experience. And that was imprinted on the jury's mind. And he knew it. He could see them. And that's the whole thing. This is the crucible of a trial. You're making decisions here. And what the district court here did was second-guess those decisions. It didn't ask the question, could a reasonable state court have said this was within the realm of professional responsibility? Putting up an expert, as we've said in our papers, had risk with it. You may make more of this issue and you may lose. Your expert may be seen as lesser than the Commonwealth's. And, you know, your expert is subject to cross-examination. Your expert may come off with an unflattering cross-examination that doesn't help your case at all. And so what I'm asking the court to do here is to look at this and see it for what it really is. This is second-guessing, and not the appropriate doubly deferential review that should have applied here. And on the procedural issue, I just would mention, at page 21 of our opening brief, our blue brief, I've quoted for the court a lengthy passage from the Fletcher case, which is a relatively recent case talking about Larry. Stop it. You have a red light. Oh, I'm so sorry, Your Honor. That's okay. Finish your sentence. I just wanted to mention that clearly indicates where Pennsylvania law is on this. And one thing, if I may add, the court can only certify the question to the Pennsylvania court if you really think this is unclear at this point. Ask the Pennsylvania courts to tell you whether or not this was waived. I'm sorry? They're busy. They don't take any certifications. But I think they might be happy to answer this for you, Your Honors. It's not my experience. Thank you, Your Honors. Thank you. We take it under advisement.